**MID ATLANTIC NEPHROLOGY CENTER, LTD., Plaintiff,**

and

**Maryland Comprehensive Health Planning Agency, Department of Health and Mental Hygiene for the State of Maryland, Realigned as Plaintiff,**

v.

**Joseph A. CALIFANO, Secretary, Department of Health, Education and Welfare, et al., Defendants.**

Civ. No. T–76–1687.

United States District Court, D. Maryland.

March 31, 1977.

Joseph D. Tydings, Baltimore, Md., Aaron L. Handleman, Washington, D. C., and Gerald C. Baker, Lanham, Md., for plaintiff.

Francis B. Burch, Atty. Gen. of Maryland, and Stephen J. Sfekas, Asst. Atty. Gen., Baltimore, Md., for realigned plaintiff.

Jervis S. Finney, U. S. Atty., and Daniel M. Clements, Asst. U. S. Atty., Baltimore, Md. (Randolph W. Gaines, Chief of Litigation, James C. Pyles, John W. Wojciechowski, and Leila H. Carp, Attys., Social Security Div., Dept. of Health, Ed. and Welfare, Washington, D. C. on brief), for Secretary, HEW.

James P. Parker, James K. Stewart and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., and Howard Goldberg and Smith, Somerville & Case, Baltimore, Md., for Long, Medical Administrative Services, Inc., and Laurel Dialysis Clinic.

THOMSEN, Senior District Judge.

Plaintiff, Mid Atlantic Nephrology Center (MANC),* filed this action on November 5, 1976, against (1) the Secretary of HEW, (2) Joseph C. Long, Jr. (Long), Medical Administrative Services, Inc. (MAS) and Laurel Dialysis Clinic (LDC),[1] and (3) Maryland Comprehensive Health Planning Agency (MdCHPA), a division of the Maryland Department of Health and Mental Hygiene. MANC, which has operated a dialysis treatment facility in Camp Springs, Maryland, since 1971, seeks primarily injunctive relief (A) to prevent Long and MAS from opening a dialysis clinic (LDC) in the Laurel, Maryland, area, some 25 miles away, and (B) to prevent HEW from disbursing any federal reimbursement funds to LDC under the End Stage Renal Disease (ESRD) program. MANC also seeks damages from Long, a former employee of MANC, for unfair competition. In its complaint MANC claims that HEW's approval of LDC's application to be qualified for federal reimbursement under the ESRD program was arbitrary and capricious, an abuse of discretion, and violated (1) the applicable federal statute and the regulations promulgated thereunder, and (2) MANC's equal protection and due process rights under the Fifth Amendment. Jurisdiction is asserted (a) under § 10 of the APA,[2] (b) under 28 U.S.C. 1331, and (c) under 28 U.S.C. 1361. MdCHPA, originally named as a defendant, has supported plaintiff's claims against HEW throughout the proceedings, and has now sought and been permitted to realign itself as a plaintiff herein, so far as the complaint seeks injunctive relief against HEW. MdCHPA makes no claim against Long, MAS or LDC.

A temporary restraining order granting the injunctive relief set out above was issued by another judge of this court and was extended by the undersigned judge so that a full hearing on both a preliminary and a permanent injunction could be held. At the close of that hearing, at which testimony was taken on five days, and many exhibits and a stipulation of 124 facts were filed, the court issued a preliminary injunction prohibiting HEW from making Medicare reimbursements to LDC, but not preventing Long and MAS from opening LDC.[3]

After the preliminary injunction was issued and the testimony had been written up, all parties filed briefs; Long and HEW filed 80 proposed findings of fact, MANC 168.[4] The court has ruled on each proposed finding, indicating that it is either found, not found, or found as modified. It would unduly prolong this opinion to include those findings, but the decision and ultimate findings and conclusions herein are based upon those detailed findings.

* **LIST OF ABBREVIATIONS USED IN THIS OPINION**

| | |
|---|---|
| MANC | Mid Atlantic Nephrology Center |
| HEW | Department of Health, Education and Welfare |
| MAS | Medical Administrative Services, Inc. |
| LDC | Laurel Dialysis Clinic |
| MdCHPA | Maryland Comprehensive Health Planning Agency |
| ESRD | End Stage Renal Disease |
| CMdHSA | Central Maryland Health Systems Agency |
| SMdHSA | Southern Maryland Health Systems Agency |
| MdCKD | Maryland Commission on Kidney Disease |

1. In 1975 Long and two individual financial backers formed Medical Administrative Services, Inc. (MAS), which operates LDC.

2. 5 U.S.C. § 701 et seq.

3. At the time the original TRO was issued, MANC was required to post a $25,000 bond; an additional $25,000 bond was required when the preliminary injunction was issued.

4. Counsel for each party have reviewed the findings proposed by their opponents, underlining in blue those portions of the findings admitted, in red those portions disputed, and in yellow those portions considered true but immaterial.

*I. Applicable Statutes and Regulations*

On July 1, 1973, pursuant to amendments to the Social Security Act which established what is now known as the End Stage Renal Disease (ESRD) Program,[5] virtually all persons suffering from chronic renal disease became eligible for hemodialysis (dialysis) treatment and kidney transplantation under Medicare.[6] Under the ESRD program the federal government, through Medicare, pays 80% of the reasonable cost of dialysis treatment beginning three months after a course of dialysis treatment has begun. As usual under Medicare, such payments are made to the supplier of services, not to the patient, and § 226(g) of the Act gives the Secretary of HEW broad discretion to prescribe by regulation the requirements which must be met by ESRD treatment facilities before they become entitled to federal reimbursement for dialysis treatment of eligible patients.[7]

Because coverage under the ESRD program was to become effective on July 1, 1973, eight months after the amendments were signed into law, HEW issued interim regulations to govern the operation of the program while additional information was collected and experience gained upon which the long-term regulations would be based. On June 29, 1973, two days before the effective date of the amendments, the interim regulations were published. They set out the circumstances under which suppliers of ESRD services could qualify for Medicare reimbursements during the interim period, namely: (a) existing facilities providing dialysis services became entitled to receive federal reimbursement for treatment of eligible patients during the period the interim regulations were in effect (the "grandfather" clause); (b) a freeze was placed on the approval of new ESRD treatment facilities—a new facility could become entitled to reimbursement during the freeze only if it met the requirements set out in the regulations for an "exception" to the freeze and was approved by HEW.

The interim regulations remained in effect until September 1, 1976, when long-term regulations went into effect.[8] Facilities receiving reimbursement under the interim regulations (whether under the grandfather clause or as an approved exception to the freeze) may continue to receive reimbursement until September 1, 1977; after that date reimbursement can continue only if the facility receives approval under the long-term regulations. No application received after September 1, 1976, is eligible for approval as an exception under the interim regulations; any such application must be filed in accordance with the long-term regulations.

MdCHPA, designated by the Governor of Maryland in 1968[9] as the state agency to receive federal health planning grants, has responsibilities with respect to the approval of facilities to receive both state and federal health care reimbursements.[10] Various

5. Act of October 30, 1972, P.L. 92–603, Title II, § 299I, 86 Stat. 1463, 42 U.S.C. § 426 (e–g) (Supp. IV, 1974) amending 42 U.S.C. § 426 (1970).

6. "Medicare" is the popular name for Federal Health Insurance for the Aged enacted by Congress in Title I of the Social Security Amendments of 1965, P.L. 89–97, §§ 101–122, 79 Stat. 286, July 30, 1965, as Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395*ll* (1970), as amended 42 U.S.C. §§ 1395–1395pp (Supp. IV, 1974).

7. "The Secretary is authorized to limit reimbursement under Medicare for kidney transplant and dialysis to kidney disease treatment centers which meet such requirements as he may by regulation prescribe: *Provided,* That such requirements must include at least requirements for a minimal utilization rate for covered procedures and for a medical review board to screen the appropriateness of patients for the proposed treatment procedures." 42 U.S.C. § 426(g) (Supp. IV, 1974).

8. See 41 Fed.Reg. 22502–22522 (1976).

9. See Md.Ann.Code, Art. 41, § 59C (1971), as amended (Supp., 1976).

10. See Comprehensive Health Planning and Public Health Services Amendments of 1966, 42 U.S.C. § 246(a) & (b) (Supp. IV, 1974), amending 42 U.S.C. § 246 (1970). These amendments to the Public Health Service Act provided for federal grants to state and local agencies within each state to perform a number of activities designed to bring the cost, distribution, and quality of health care under control.

local agencies were established, including those now known as the Central Maryland Health Systems Agency (CMdHSA) and the Southern Maryland Health Systems Agency (SMdHSA), which are federally funded (see note 10), and aid MdCHPA in the performance of its state and federal responsibilities.[11] In addition to those planning agencies, Maryland established, effective July 1, 1971, a Kidney Disease Program,[12] the first of its kind in the country, to gather and disseminate information concerning the treatment of renal disease, and to make such treatment more widely available to Maryland citizens by providing for state payment of part or all of the cost of such treatment.[13] A Commission on Kidney Disease (MdCKD) was set up to develop and promulgate standards for the operation of dialysis facilities in Maryland and for the acceptance of patients for treatment in those facilities.[14]

Under the State Kidney Disease Program the appropriate local planning agency investigates each facility which wishes to receive state reimbursement to determine whether it meets the standards set by the MdCKD and conforms to the areawide comprehensive health plans;[15] on the basis of its investigation a recommendation with respect to whether that facility should be "certified" is made to MdCHPA. A facility

meeting the standards set by MdCKD and approved by the MdCHPA as being in conformance with the state comprehensive health plan, is certified by the Maryland Department of Health and Mental Hygiene.[16] A patient eligible for and wishing to receive state payment can be treated only at a certified treatment facility.[17]

In addition to the functions performed by the various state agencies with respect to the state program, MdCHPA and through it the local agencies assist HEW in determining whether a facility applying for federal approval meets certain requirements for participation in the federal ESRD reimbursement program. Specifically, HEW has regularly consulted MdCHPA regarding the need for a proposed ESRD facility and its conformance with the state comprehensive health plan. Also, pursuant to statutory authorization and under an agreement between HEW and the state, MdCHPA makes recommendations to HEW under § 1122 of the Social Security Act[18] with respect to the need for proposed capital expenditures on health care facilities.

Before the implementation of the federal ESRD program, the state was authorized by Md.Ann.Code, Art. 43, § 788, to pay 100% of the certified cost of dialysis treatment of eligible Maryland citizens not covered by other insurance. Since July 1, 1973,

One of the functions of the agencies was to develop state and areawide comprehensive health plans setting out the need for various health care services throughout the state.

11. The local agencies were originally known as the Regional Planning Council and Prince George's Health Advisory Committee, respectively, until July 1976 when their names, and some of their responsibilities, were changed to conform with the federal-state planning scheme established by the National Health Planning and Resources Development Act of 1974, January 4, 1975, P.L. 93–641, § 2 et seq., 88 Stat. 2226, 42 U.S.C. § 300k–1 et seq. (Supp. IV, 1974). The old names will not be used in this opinion although they do appear at times in the findings of fact.

12. Md.Ann.Code, Art. 43, §§ 781–790 (Supp., 1976).

13. The federal statutes and regulations use the term "renal disease", whereas the state statutes and regulations sometimes use the term "kidney disease". The terms are synonymous.

14. Md.Ann.Code, Art. 43, § 784.

15. Each local planning agency develops an "areawide" health plan for the geographical area for which it has responsibility. This plan is a subpart of the state comprehensive health plan.

16. Md.Ann.Code, Art. 43, § 785(a).

17. *Id.*

18. 42 U.S.C. § 1320 a–1. This section allows the Secretary, with respect to a facility which is not approved under § 1122, to deduct from the reasonable cost of medical services provided at such facility certain depreciation and other expenses attributable to the disapproved capital expenditures, thus lowering the amount of reimbursement to which the facility is entitled. See post p. 36.

the federal ESRD program and the state Kidney Disease Program have generally worked together to cover the total cost of dialysis treatment of individuals who qualify for both federal and state coverage. An individual who is eligible under both programs, and who is treated at a facility which has been approved under both programs, may have 100% of the cost of treatment during the first three months, and 20% of all treatment thereafter, paid for by the state to the extent that such treatments are not covered by other insurance. The federal ESRD program pays 80% of such cost after the initial three month period has passed. Although the cost of a dialysis treatment has risen dramatically throughout the country since the inception of the federal program,[19] during the same period MdCHPA, in cooperation with the state's Kidney Disease Program, has succeeded in reducing substantially the cost of a dialysis treatment in Maryland.

## II. Summary of Findings of Fact

On September 10, 1975, in order to obtain both state and federal approval for LDC, a proposed ten station free-standing [20] dialysis facility in the Laurel area, Long applied to MdCHPA for (1) certification of conformance to the state's comprehensive health plan (one of the requirements for participation in the state's Kidney Disease Program) and (2) approval under § 1122 (see note 18 and text). On September 30, 1975, MANC made a similar application for a similar facility in the Laurel area. MdCHPA promptly forwarded the applications to the local planning agencies (Long's to CMdHSA, and MANC's to SMdHSA) [21] to determine whether each application conformed to the appropriate areawide health plan, and to recommend to MdCHPA (1) whether certificates of conformance with the state comprehensive health plan should be issued, and (2) whether the applicant

should receive § 1122 approval. The local planning agencies were also to determine whether each applicant met the other requirements for participation in the state reimbursement program. Until shortly before the filing of this suit, the local agencies deferred making any final decision: (A) with respect to Long's application, initially in order to obtain information from Long which was not included in his application, and (B) with respect to both applications, to allow MdCKD to complete a study it was conducting into the need for new, and the utilization of existing, renal disease treatment facilities in Maryland. With respect to item (B), the State had on March 4, 1976, in effect placed a moratorium on the consideration of all applications for reimbursement approval of dialysis treatment facilities in Maryland, to await the outcome of the MdCKD study.

On March 22, 1976, Long filed an application with HEW under the interim regulations for federal approval of LDC as eligible for reimbursement under the ESRD program. As was customary, HEW notified MdCHPA of the application and asked MdCHPA to give HEW its opinion concerning the need for such a facility in the Laurel area. An official of MdCHPA (Pyle) responded by letter that no opinion could be given until the state review process with respect to the already pending state application was complete. In mid-June the HEW official responsible for reviewing Long's federal application (Coleman) contacted MdCHPA by phone, and was informed by Pyle that no action would be taken until the MdCKD report had been completed and issued. Coleman made another call to MdCHPA in mid-July, while Pyle was on vacation, and was not referred to anyone who knew the status of Long's application or of the MdCKD report. On August 9, without either Pyle or Coleman

**19.** The evidence indicates that it may now be about $25,000 a year per patient.

**20.** A free-standing facility is one not operated by a hospital. *Compare* 20 C.F.R. Subpart B, App. II.A. with II.B. (1976).

**21.** Long's was for a station on the east side of the Patuxent River and MANC's for a station on the west side of that river, which is the borderline between Prince George's County and Anne Arundel County.

having made any further attempt to contact the other, Coleman met with a representative of the Public Health Service to consider Long's federal application; as a result of this meeting Coleman recommended approval of LDC for an exception to the ESRD freeze. On August 19, 1976, Long's application was given formal approval by HEW.

Upon learning of Long's federal approval, MANC and MdCHPA took independent action. MANC attempted to file a federal application for an exception before the August 31 expiration of the interim regulations by sending HEW a letter dated August 30 setting out the status of its transfer application then pending before the state agencies.[22] HEW replied that MANC's letter did not constitute a formal application and that MANC would have to file for approval in accordance with the long-term regulations. MdCHPA formally protested to HEW its approval of LDC without waiting for state input. In reply to MdCHPA, HEW took the position that the state had delayed unduly in acting on Long's application, and that HEW was not obligated, in any event, to obtain state input before acting on an application for federal approval.

Thereafter, and before the complaint in this action was filed, the moratorium on state applications was lifted, and upon the recommendations of SMdHSA and CMdHSA respectively, MdCHPA approved MANC's application and disapproved Long's application for state certification and federal 1122 approval.

*III. Jurisdiction*

Both MANC and MdCHPA assert jurisdiction (a) under § 10 of the APA, (b) under 28 U.S.C. § 1331, and (c) under 28 U.S.C. § 1361.

(a)

In *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Court held that "the APA is not to be interpreted as an implied grant of subject-matter jurisdiction to review agency actions". Its provisions may, however, provide the standard of review of certain questions in cases in which an independent jurisdictional ground exists.

(b)

Section 1331 gives jurisdiction to this court unless such jurisdiction is precluded by 42 U.S.C. § 1395ii,[23] which makes the provisions of 42 U.S.C. § 405(h)[24] applicable to actions arising under Title XVIII (Medicare) of the Social Security Act "to the same extent as they are applicable with respect to" Title II (Benefits) of that Act. Section 405(h) has been held to preclude actions against the Secretary under § 1331 to recover on any claim for disability benefits under Title II. Such claims are reviewable only in accordance with the statutory review procedure set out in Title II. *Califano v. Sanders,* supra; *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); cf. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The case at bar, however, presents a different problem from the one presented in those cases. It does not involve a claim for benefits or for any other payments claimed

22. On April 12, 1976, MANC had changed its original application for a *new* Laurel facility to request a *transfer* of four dialysis stations from its existing Camp Springs facilities to bring itself more in line with the state finding of underutilization of dialysis facilities.

23. Section 1395ii provides in pertinent part: "The provisions * * * of subsection * * * (h), * * * of section 405 of this title, shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter."

24. "(h) The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section [1331] of Title 28 to recover on any claim arising under this subchapter."

to be due under Title XVIII. It merely seeks injunctive relief to compel HEW to abide by its own regulations.[25] Moreover, plaintiffs have available to them no statutory review process under Title XVIII by which to challenge the legality of the HEW action which they allege has caused them injury.[26] Although the HEW decision not to reopen a claim for disability benefits involved in *Sanders,* supra, was not itself reviewable under the statutory procedures, a person aggrieved by any such refusal *is* provided administrative and judicial review at some stage in the administrative processing of his claim, namely, at the time HEW initially denies his claim for benefits.

 Although no decision in the Supreme Court or the Fourth Circuit controlling this point has been cited or found, many of the pre-*Sanders* decisions in other circuits which held that no jurisdiction exists under § 1331 over claims arising under Title XVIII based jurisdiction to review agency action on § 10 of the APA.[27] However, the holding in *Sanders* that jurisdiction under § 10 does not exist, requires reconsideration of the question whether jurisdiction exists under § 1331 in such a case as this. This court concludes that although the question is a close one, jurisdiction under § 1331 exists over a suit such as this against the Secretary for injunctive relief where no statutory review of the challenged action is available to the plaintiff. Cf. *Americana Nursing Centers, Inc. v. Weinberger,* 387 F.Supp. 1116 (S.D.Ill.1975); *Humana of South Carolina, Inc. v. Mathews,* 419 F.Supp. 253 (D.D.C.1976), appeal pending; *Schupak v. Mathews,* Civil Action No. 75–1109 (D.D.C., Sept. 17, 1976), appeal pending; *American Medical Association v. Mathews,* 429 F.Supp. 1179 (N.D.Ill.1977).

 With respect to the standing of plaintiffs to bring this action, MANC and MdCHPA alleged injury in fact sufficient to satisfy constitutional prerequisites. *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Association of Data Processing Services v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). MANC and MdCHPA claim that HEW failed to follow its own regulations in approving Long's application on behalf of LDC to become entitled to receive reimbursement under the federal ESRD program. MANC further claims that such approval has injured and will injure it in the operation of its existing facility in Camp Springs and in its proposed facility in the Laurel area by causing it to lose patients to LDC, and will harm MANC's chances of being approved under

---

**25.** Section 405(h) precludes an action "to recover on any claim". A suit which is not for benefits or other damages is therefore not precluded by the terms of the statute. See *Griffin v. Richardson,* 346 F.Supp. 1226, 1230 (D.Md.), *affirmed,* 409 U.S. 1069, 93 S.Ct. 689, 34 L.Ed.2d 660 (1972); *Gainville v. Richardson,* 319 F.Supp. 16, 18 (D.Mass.1970); *Salfi,* supra, 422 U.S. at 797–799, 95 S.Ct. 2457 (Brennan, J., dissenting opinion). The majority opinion in *Salfi,* which involved a claim for benefits, is not inconsistent with this position.

**26.** HEW regulations provide for administrative review of "determinations with respect to" whether an ESRD treatment facility satisfies the conditions necessary to receive Medicare reimbursement. 20 C.F.R., Chapter III, Subpart O (1976). This procedure is not compelled by any provision in Title XVIII and is not sufficient to bring such determinations within the statutory review provisions of 42 U.S.C. § 1395ff(c). Cf. *Sanders,* supra, 430 U.S. at 108–109, 97 S.Ct. 980. Moreover, these regulations afford review only to applicants denied approval. See 20 C.F.R. § 405.1501(c) (1976). A person aggrieved by approval has no regulatory or statutory avenue of review.

**27.** E. g., *Hazelwood Chronic & Convalescent Hospital v. Weinberger,* 543 F.2d 703 (9th Cir. 1976); *Gallo v. Mathews,* 538 F.2d 1148 (5 Cir. 1976); *St. Louis University v. Blue Cross Hospital Services,* 537 F.2d 283 (8th Cir.), cert. denied, 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976); *Aristocrat South, Inc. v. Mathews,* 420 F.Supp. 23 (D.D.C.1976). Cf. *South Windsor Convalescent Home, Inc. v. Mathews,* 541 F.2d 910 (2 Cir. 1976), and *Whitecliff, Inc. v. United States,* 536 F.2d 347 (Ct.Cl.1976), petition for cert. filed, 45 U.S.L.W. 3602 (February 28, 1977), in which an alternative to § 1331 jurisdiction was found to exist under 28 U.S.C. § 1346.

the long-term regulations for reimbursement to its own proposed Laurel facility. MdCHPA claims that the integrity of its comprehensive health plan has been and will continue to be damaged and that the per patient cost to the state of its kidney program will be unnecessarily increased by the HEW action. The interests of MANC and of MdCHPA alleged to have been injured are within the zone of interests regulated by the ESRD statute and some of the regulations promulgated thereunder;[28] plaintiffs have standing to raise the claims based on injury to those interests. *Data Processing,* supra; *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).[29] The court also permitted plaintiffs to press other claims they have asserted based on alleged violations of regulations designed to protect the public interest and not any particular interest of either plaintiff. *Federal Communications Commission v. Sanders Bros. Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940).

#### (c)

With respect to jurisdiction under 28 U.S.C. § 1361, MANC has alleged that HEW's approval of LDC for federal reimbursement and HEW's failure to approve MANC for such reimbursement violated duties owed by HEW to MANC. MANC, however, has pointed to no statutory or regulatory provision upon which it bases its contentions that HEW had any such duties. Even if the complaint is read to allege that HEW granted LDC approval without performing the necessary investigation to determine that LDC met the requirements for approval imposed by the regulations, whatever duty HEW may have to perform such an investigation is not a duty owed to MANC, and cannot support jurisdiction under § 1361 in this case.

#### (d)

MANC's claim against Long individually, based on alleged unfair competition, does not present any issues under federal law and, absent diversity jurisdiction, which does not exist in this case, could be maintained only under the doctrine of pendent jurisdiction. Little evidence and no argument in support of or against that claim was presented, and the court concludes that it should be dismissed without prejudice to its assertion in another forum.

### IV. Merits

The interim regulations require that a free-standing dialysis facility applying for federal approval under the ESRD program meet a number of requirements before becoming entitled to reimbursement for the treatment of federally qualified dialysis patients. MANC and MdCHPA contend that Long's application did not satisfy those requirements and, therefore, that HEW's approval of LDC was arbitrary and capricious, and an abuse of discretion.

MANC also contends that such approval violated MANC's constitutional rights.

Each of the regulatory requirements plaintiffs contend were not met will be considered in light of the limited scope of review accorded to the district courts by the Administrative Procedure Act. 5 U.S.C. § 706; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). See also *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Budd v. Occupational Safety Review Commission,* 513 F.2d 201 (3 Cir. 1975); *Jno. McCall Company v. United States,* 374 F.2d 689 (4 Cir. 1967); *Montgomery County, Md. v. Ball,* 416 F.Supp. 737 (D.Md.1975).

---

**28.** In particular, see the regulations concerning the source of patients and the need for a proposed dialysis facility and the regulation concerning § 1122 review explained below, post 36. 20 C.F.R. Subpart B, App. II.B.2, 3 & 7 (1976).

**29.** See also Havighurst, Regulation of Health Facilities and Services by "Certificate of Need", 59 Va.L.Rev. 1143, 1174 (1973).

A. *Requirements under the Interim Regulations, 20 C.F.R., Chapter III, Subpart B. Appendix, § II.B. (1976)*

*(i) Re: State Licensure Requirements*

 Section II.B.1.a. of the interim regulations requires that a free-standing renal dialysis facility, in order to receive HEW approval, "meet State or local licensure requirements, if any". Plaintiffs argue that LDC fails to meet this requirement because it has not received "certification" from the Maryland Department of Health and Mental Hygiene pursuant to Md.Ann.Code, Art. 43, § 781 et seq. That fact is undisputed; the question is whether it constitutes a failure to meet state "licensure" requirements within the meaning of the regulations.

Section 785 of the Maryland statute sets forth the certification requirement for dialysis facilities in the state. Certification is a condition precedent to reimbursement under the State Kidney Disease Program, but not to lawful operation of a dialysis facility which does not receive such reimbursement from the State.[30] This court concludes that HEW's position that such certification is not a "licensure requirement" within the meaning of its regulations is neither an unreasonable interpretation of the regulations nor inconsistent with the ESRD statute, and that it is not a valid ground for the issuance of injunctive relief herein.

*(ii) Utilization Rate and Quality of Care*

 Section II.B.2. of the interim regulations provides that renal dialysis facilities "are expected to meet an acceptable utilization rate and otherwise demonstrate a capacity to perform at high quality". MANC and MdCHPA contend that LDC does not meet this requirement.

This section has two subparts, a, dealing with "utilization rate", and b, dealing with quality of care. Subpart a provides:

"*Free-standing facilities are expected to meet an acceptable utilization rate. The facility has a minimum of two main-*

tenance dialysis stations, and operates each maintenance dialysis station a minimum of 5 dialysis sessions per week." The evidence shows that the LDC application was approved for six dialysis stations, four more than required by the regulation. With regard to minimum utilization, HEW did not consider it possible for a new dialysis facility to satisfy this requirement immediately upon opening; it considered the requirement satisfied if it was probable that minimum utilization would be achieved in a reasonable period of time. Despite the state agency's conclusion to the contrary, HEW found it probable that LDC would meet the minimum utilization rate in a reasonable period of time. It based that finding on its own statistics which, HEW concluded, reflect geographic maldistribution in Maryland, and on expected growth in the kidney patient population in the Laurel area. This court concludes that the interpretation given the regulation and the investigation conducted to determine whether it was satisfied were within the bounds of lawful administrative action.

 Subpart b, dealing with quality of care, requires, inter alia, affiliation agreements with other health care suppliers to provide certain services incident to dialysis treatment; that requirement is discussed in the next section of this opinion. MANC also argues that LDC made no showing in its application that it would have sufficient financial stability to insure a high quality of care to its patients. HEW was satisfied with the information it had, and the burden of proof was on plaintiffs to show that such satisfaction was unjustified; they failed to meet that burden.

*(iii) Affiliation Agreements*

 Section II.B.1.c. requires a dialysis facility to

"*Have an affiliation, e. g., has arrangements for back-up care, etc., with a participating hospital. The participating hospital with which the free-standing fa-*

---

**30.** Compare Md.Ann.Code, Art. 43, § 559(a-1), which requires as a condition of licensing that a hospital or related institution conform to or is not inconsistent with the comprehensive health plan.

cility has its arrangements and agreements is approved to deliver ESRD services under the Medicare program."

Other sections of the regulations require affiliation agreements or arrangements for the provision of many other services incident to free-standing renal dialysis. 20 C.F.R. Subpart B, App. II.B.2.b.(1)(c); II.B. 2.b.(4). Plaintiffs contend that LDC did not have such agreements or arrangements, although Long represented to HEW in his application that LDC did have them.

In approving Long's application, HEW relied on the representations in that application and on letters attached thereto from hospital officials indicating an intent to enter into agreements to provide some of those services. HEW interprets its regulations to permit it to rely on such representations and letters; it supports Long's argument that, in many cases, it is impossible to obtain an agreement from a hospital to provide the services in question until the dialysis facility obtains state approval, and that a letter of intention is all that can be obtained. That may be true. The court also finds, however, that Long has not supplied HEW with letters or other information which would convince the court that LDC either had or would obtain the required agreements or arrangements. The information did satisfy HEW, however, and the court cannot say that HEW's action was unreasonable or in violation of its interim regulations. The court notes that the long-term regulations require more documentation of affiliation agreements than was required by the interim regulations. Both MANC and LDC must be approved under the long-term regulations in order to receive federal reimbursement after September 1, 1977.

*(iv) Needed Contribution to Access of Care*

MANC and MdCHPA contend that LDC did not meet the requirement of Section II.B.3. of the interim regulations—that a dialysis facility make a "needed contribution to access of care".

Subpart a of that section requires "evidence to document that there are ESRD patients acceptable for therapy" at the dialysis facility for which application is made. Plaintiffs claim that LDC did not satisfy that requirement and that HEW's failure to investigate the information bearing on that requirement contained in the LDC application[31] was an abuse of discretion. The information contained in the LDC application was, however, "evidence to document" the existence of some patients acceptable for treatment. Although HEW's failure to make an independent investigation to substantiate such information contained in ESRD applications is not the most effective means of fulfilling its responsibility for preventing the costly proliferation of unnecessary dialysis facilities, the court cannot say that HEW's action in this case was an abuse of discretion—it was within the literal meaning of the regulation though not within its spirit. HEW must be granted some latitude in the administration of an interim program to which it may not be entitled once the final program is operational.

Subpart b of that section requires that the patients whom the applicant expects to treat "cannot reasonably be expected to receive appropriate therapy from another facility". Plaintiffs base the contention that this requirement was not met by LDC upon the testimony from various state officials that there is no need in Maryland for *new* dialysis facilities, and evidence tending to show that some of the patients who would be treated at LDC are now receiving treatment at MANC's Camp Springs facility.

The determination of need is a complex process involving several considerations. MdCHPA focused on the statewide underutilization found in the report of the Maryland Kidney Commission. HEW was concerned about the effect on the Laurel community of "geographical maldistribu-

---

**31.** The application stated that ten patients would be awaiting dialysis in the Laurel area by the middle of June 1976, and identified them by their initials. During the trial Long could account for only three of these patients.

tion of dialysis facilities", and approved Long's application on that basis. It is clear that HEW and MdCHPA took different views of the need in the Laurel area and of the means by which any such need should be satisfied. If the law required or permitted the court to make the determination, the court would find that the position taken by MdCHPA was the more reasonable. That, however, is not the function of the court; under the facts as found and the applicable law the court cannot say that HEW's determination was either an abuse of discretion or arbitrary and capricious. Although the lack of cooperation between HEW and the state agencies is not to be commended, this court can find nothing in this regulation which required HEW to consider the views of the state agencies on the need for the proposed dialysis facility. Moreover, MdCHPA delayed unduly in acting on Long's application and failed to make clear to HEW the reasons for such delay.

▮▮▮ Subpart c states that there must be "no other applicants better qualified to meet the needs of these patients". Despite much evidence put forth by MANC as to its intentions to file for federal approval after it had completed the state review process, the fact is that it never filed a valid application with HEW under the interim regulations. It could not have been a better qualified applicant than LDC for approval under those regulations; at the time HEW made its decision to approve the LDC application, there does not appear to have been any other application pending before it for a facility in the Laurel area.

### (v) Section 1122 Determination

Plaintiffs contend that Long's application did not meet the requirements set out in Section II.B.7. of the interim regulations that a dialysis facility "not have been disapproved in accordance with Section 1122".

Section 1122 is designed "to assure that Federal funds appropriated under Title

* * * XVIII * * * are not used to support unnecessary capital expenditures made by or on behalf of health care facilities * * * which are reimbursed under any * * * [title] and that, to the extent possible, * * * [such reimbursement] * * * shall support planning activities with respect to health services and facilities in the various States". 42 U.S.C. § 1320a–1(a). Under the provisions of this section, the designated planning agency for each state, here MdCHPA, surveys a proposed capital expenditure on a health care facility to determine whether it complies with the state comprehensive health plan and other standards and criteria developed pursuant to the Public Health Service Act[32] to meet the need for adequate health care facilities in the area. If the state agency finds a proposed capital expenditure is inconsistent with the applicable plans, criteria or standards, HEW is authorized to exclude expenses attributable to such capital expenditure[33] from the determination of the federal health care reimbursement payments to a facility making a capital expenditure in spite of disapproval. Before the promulgation by HEW of the interim ESRD regulations the only effect of § 1122 was on the *level* of federal reimbursement which a health care facility was entitled to receive; it had no effect on the determination whether a facility was *qualified* to receive any federal reimbursement; the interim ESRD regulations effective July 1, 1973, tied § 1122 to the determination whether a facility is so qualified, by prohibiting HEW from granting ESRD approval to a renal disease treatment facility which has been disapproved under § 1122.

At the time HEW approved the LDC application under the ESRD program (August 22, 1976), MdCHPA had made no determination with respect to LDC's § 1122 certification despite the fact that Long had applied directly to MdCHPA for § 1122

---

**32.** See n. 10, supra.

**33.** E. g., depreciation, interest on loans, return on equity capital.

review of LDC in September, 1975.[34] HEW regulations governing § 1122 require state planning agencies to respond within 90 days following receipt of notice of a proposed capital expenditure on a health care facility from a person proposing such an expenditure, unless that person agrees to a longer period. 42 C.F.R. § 100.106(a)(4) (1975). The regulations further provide that the failure of the state agency to respond to the applicant within the 90 days—or the extended period, if the applicant has agreed thereto—shall have the effect of a determination by the state agency that the applicant is in conformance with the state comprehensive health plan. Id. In his application to MdCHPA Long agreed to follow the state certification review time schedule.

HEW argues that because the 90 day period for state action on 1122 review had long since expired when HEW approved Long's ESRD application,[35] the application had in effect been approved by the state agency as being in conformance with the Maryland comprehensive health plan. Moreover, HEW argues, it had not been "disapproved" within the meaning of the interim regulation. Plaintiff and MdCHPA argue that Long had agreed to the extended period, and therefore (1) his application had not "in effect" been approved, and (2) that *some* action by MdCHPA was necessary before HEW could treat an application as not having been disapproved.

The court agrees with plaintiffs that in a situation such as this, in which an applicant has agreed to follow the state review time schedule, some action or inaction by the state agency which results in or has the effect of approval or disapproval under § 1122 would normally be necessary before a facility could properly be approved for participation in the ESRD program. To hold otherwise would mean that HEW could circumvent the purpose of its own regulation—to control the costs of dialysis by ensuring that only those dialysis facilities which conform with a state's comprehensive health plan receive federal approval—merely by approving ESRD applicants before the state agency has had time to complete its § 1122 review. However, the excessive delay by MdCHPA in this instance, and its failure formally to communicate to HEW MdCHPA's own procedures with respect to the MdCKD moratorium as the cause for that delay, make this an abnormal case. In view of these factors, HEW's actions should not be set aside as unreasonable, arbitrary and capricious or an abuse of discretion.

### B. Constitutional Claims

MANC's due process and equal protection claims, which it has not pressed vigorously in its briefs and argument, must be denied. With respect to its due process claim, MANC has no constitutionally protected property interest in the continued treatment of specific federally qualified patients. If such patients who now receive treatment from MANC choose to be treated by LDC in the future, it will be of their own free will and not as a result of government compulsion. With respect to MANC's equal protection claims, it is enough to note that LDC received approval from HEW under the interim regulations and MANC did not for the simple reason that LDC had filed a valid application for interim approval and MANC had not.

### V. Conclusion

As the foregoing analysis has shown, HEW's action in this matter, while less than exemplary, has not been an abuse of discretion or so arbitrary and capricious as to warrant this court in granting permanent injunctive relief. The court hopes that HEW will exercise greater care in approv-

**34.** HEW had notified MdCHPA of Long's HEW application for ESRD approval of LDC in March, 1976.

**35.** About ten months had passed since MdCHPA received notice of the proposed capital expenditure for LDC. Close to 400 days passed before MdCHPA finally disapproved LDC. The reason for the delay was to permit the MdCKD to complete its study of the need for further dialysis facilities in Maryland, discussed in the first paragraph of the Summary of Findings of Fact, above.

**38**

ing applications under the long-term regulations, and that better liaison between HEW and the Maryland agencies can be established, especially since the evidence shows that the Kidney Commission is doing a careful job to assure that adequate treatment facilities are available throughout the State without unnecessary expenditure of public funds.

Judgment will be entered in accordance with this opinion. An order vacating the preliminary injunction has been filed today.